ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| BILLY SIERRA RÍOS<br><br>Parte Apelante<br><br><br>v.<br><br><br>WESTERN AUTO PUERTO RICO, INC. H/N/C ADVANCE AUTO PARTS<br><br>Parte Apelada | KLAN202400526 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.:<br><br>BY2023CV00501<br><br>Sala: 503<br><br>Sobre:<br>Reclamación Laboral (Ley Núm. 2-1961, según enmendada; Ley Núm. 80-1976, según enmendada) |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de junio de 2024.

Compareció ante este Tribunal la parte apelante, el Sr. Billy Jay Sierra Ríos (en adelante, el "señor Sierra Ríos" o el "Apelante"), mediante recurso de apelación presentado el 30 de mayo de 2024. Nos solicitó la revocación de la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, el "TPI"), el 19 de mayo de 2024, notificada y archivada en autos el 20 de mayo de 2024. Mediante el referido dictamen, el TPI declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**" interpuesta por Western Auto Puerto Rico, Inc. (en adelante, "Western Auto" o el "Apelado").

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

### I.

El caso de autos se originó con la presentación de una "**Querella**" sobre reclamación laboral por parte del Apelante en contra de Western Auto, al amparo del procedimiento sumario instituido en la Ley Núm. 2 de

17 de octubre de 1961, según enmendada, conocida como la "Ley de Procedimiento Sumario de Reclamaciones Laborales", 32 LPRA secs. 3118 *et seq*. Mediante la misma, alegó que el 22 de enero de 2006, comenzó a laborar para el Apelado como empleado parcial en el área de piso de ventas en la tienda Advance Auto Parts (en adelante, "Advance Auto"), ubicada en el Municipio de Bayamón en la Plazoleta del "Cantón Mall". Expresó que en el año 2008 pasó a ser "driver" comercial de la referida localidad. Manifestó que en el año 2010 ocupó la posición de "Service Pro", encargándose así de las gomas y servicio al cliente. Indicó que en el 2011 fue promovido a la posición de "Retail Part Pro" y que en el 2013 fue ascendido al puesto de "Assistant General Manager" de Advance Auto. Afirmó que para el año 2016 lo promovieron al puesto de "General Manager" en la tienda del Apelado, ubicada en "Rexville Plaza" en el Municipio de Bayamón. Expresó que, en el año 2017, regresó a la tienda ubicada en la Plazoleta del "Cantón Mall" en calidad de "General Manager". Señaló que ese mismo año, dicha tienda fue seleccionada como la tienda "Top Performance" en ventas del Distrito. Acentuó que en el año 2018 fue reconocido como Gerente del año y que en la evaluación del 2021 excedió las expectativas. Esbozó que durante el transcurro de dichos reconocimientos, en Advance Auto aplicaba una política de ajustes de precio, la cual incluía "Price Override" y "Price Match".

Asimismo, expresó que a pesar de que, en el año 2022 el techo de la tienda se cayó, tuvo un año operacional de mucho éxito. Manifestó que las fechas posteriores a la caída del techo, trabajó incansablemente, día y noche, velando por los mejores intereses de la empresa. Señaló que ese mismo año ganó un reconocimiento de "Penzoil" y un viaje a Las Vegas, Nevada por haber sido la tienda que más unidades de aceite vendió en toda la compañía. Alegó que el 25 de noviembre de 2022 fue despedido de su trabajo ilegalmente y sin justa causa.

Aseveró que el Apelado maliciosamente y/o de manera negligente ignoró que estaba dentro de sus funciones conceder ajustes de precios para ventas, conforme lo dispuesto en su política de "Price Override" o

"Price Match". Indicó que Western Auto tampoco siguió el proceso de operaciones correctivas que dicta su política de acciones disciplinarias. Expresó que el 22 de noviembre de 2022 recibió una llamada del Apelado mediante la cual le comunicaron que estaba suspendido. De igual manera, expresó que, al día siguiente, recibió otra llamada a través de la cual le informaron que debía reportarse el 25 de noviembre de 2022 a las oficinas centrales a las 10:00 a.m. Expresó que, durante esa cita, el Apelado le comunicó que estaba despedido. Indicó que durante dicha reunión alertó de forma inmediata que: (1) se le estaba despidiendo de manera injusta, ya que las decisiones sobre precios y ajustes era una práctica autorizada a los "General Managers" en las tiendas a base de la política "Price Override" y "Price Match", (2) otras tiendas estaban incurriendo en la misma práctica, (3) el "District Manager", el Sr. Esteban Rivera (en adelante, el "señor Rivera"), estaba al tanto del "price override" a clientes comerciales y que (4) el propio señor Rivera le había solicitado descuentos similares en el pasado para poder adquirir piezas para otros clientes comerciales.

Además, mencionó que en sus 17 años de servicio nunca recibió acciones disciplinarias ni evaluaciones negativas. Alegó que no realizó nada que ameritara su despido y que siempre inspiró a su equipo y mantuvo la integridad de la compañía. Esgrimió que, en el proceso de despido, Western Auto violó su política de acciones disciplinarias. Expresó que en todo momento de su empleo mantuvo un desempeño satisfactorio y sobresaliente y nunca incurrió en conducta lesiva. Por último, resaltó que el Apelado no lo colocó en un programa de mejoramiento antes de su despido. A tenor con lo anterior, arguyó que su despido fue injustificado y reclamó una compensación por concepto de la mesada, indemnización progresiva, honorarios de abogado y costas del procedimiento.

El 10 de febrero de 2023, Western Auto presentó su "**Contestación a Querella**", mediante la cual negó las alegaciones esgrimidas por el Apelante y arguyó afirmativamente que las prácticas de ventas del señor Sierra Ríos eran contrarias a las políticas del Apelado. Luego de varios trámites procesales impertinentes a la controversia que nos ocupa, el 2 de

octubre de 2023, Western Auto presentó una "**Moción de Sentencia Sumaria**" mediante la cual argumentó que no existían controversias de hechos esenciales que impidieran la resolución sumaria del caso. En detalle, alegó que no existía controversia respecto a que el Apelante reiteradamente incumplió con los procedimientos de la compañía, incurrió en actos de insubordinación y que a pesar de que fue advertido directamente de las consecuencias de continuar con dicha conducta, no la modificó. También afirmó que la conducta del Apelante fue desleal y falló en su responsabilidad de dar ejemplo de cumplimiento con las políticas y procedimientos a sus subordinados. Además, señaló que el señor Sierra Ríos no contaba con evidencia que demostrara que su despido fue uno injustificado. Anejó a esta los documentos que, a su juicio, respaldaban su postura.

Más adelante, el 31 de agosto de 2023, el señor Sierra Ríos presentó "**Moción en Oposición a "Moción de Sentencia Sumaria"** (en adelante, "Oposición"), a través de la cual reiteró las alegaciones expuestas en la "**Querella**". También alegó que, para justificar su despido, Western Auto propuso traer prueba de que se le ofrecieron oportunidades para mejorar y corregir su conducta, lo cual no fue cierto. Expresó que cierta advertencia con fecha del 5 de agosto de 2022 fue marcada como última advertencia escrita, a pesar de que no lo era. Señaló que, de los 61 hechos alegados por el Apelado como materiales, ocho (8) son acciones remotas e impertinentes al presente caso. Adujo que Western Auto prescindió de incluir las evaluaciones intituladas "Year End to Date" y "Mid Year" correspondientes a los años 2021 y 2022, respectivamente. Argumentó que a pesar de que el Apelado sustentó su "**Moción de Sentencia Sumaria**" en el supuesto de que él conocía que estaba haciendo mal su trabajo, en la evaluación del año 2022 no se lo mencionaron. Adujo que la evaluación "Mid Year" derrota cualquier presunción de que el despido fue por justa causa y que un examen de esta debía ser suficiente para que se declarara "No Ha Lugar" la "**Moción de Sentencia Sumaria**" y se

impusieran honorarios de abogado y costas por temeridad al Apelado, por no actuar de manera conducente al descubrimiento de la verdad.

Del mismo modo, alegó que el hecho de que no se hayan incluido en las evaluaciones las alegadas violaciones a las políticas de descuentos ni las pérdidas económicas significaba que el propio Apelado ocasionó dicho problema. Expresó que si él no sabía dónde estaba fallando, no podía corregir su error. Arguyó que la negligencia, desorganización, falta de comunicación adecuada entre los superiores y las interpretaciones maliciosas para perjudicarlo provocaron controversias reales de hechos materiales que impedían la disposición sumaria del caso. Por último, señaló que la falta de prueba, los documentos no autenticados ni admitidos como evidencia y las admisiones de Western Auto por vía del señor Rivera, apoyaban su postura de que existían controversias de hechos esenciales y que el tribunal debía dirimir estas cuestiones de credibilidad en un juicio plenario. Finalmente, el 19 de mayo de 2024, el TPI emitió una *Sentencia a* través de la cual declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**" interpuesta por Western Auto y desestimó, con perjuicio, la "**Querella**".

Insatisfecho con lo anteriormente resuelto, el Apelante acudió ante este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

> **PRIMER ERROR: ERRÓ Y ABUSÓ DE SU DISCRECIÓN EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA SUMARIA CUANDO EXISTEN CONTROVERSIAS REALES Y SUSTANCIALES RESPECTO A HECHOS ESENCIALES Y MATERIALES QUE MOTIVARON EL PLEITO, ASÍ COMO ASUNTOS DE CREDIBILIDAD E INTENCIÓN A DIRIMIR QUE LE IMPEDÍAN DICTAR SENTENCIA SUMARIA EN ESTE CASO.**
>
> **SEGUNDO ERROR: ERRÓ Y ABUSÓ DE SU DISCRECIÓN EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDERLE GRAN PESO Y VALOR A PRUEBA IRRELEVANTE, IMPERTINENTE, INADECUADA Y REMTA SOBRE ACCIONES DISCIPLINARIAS.**
>
> **TERCER ERROR: ERRÓ Y ABUSÓ DE SU DISCRECIÓN EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ADMITIR DOS DOCUMENTOS LOS CUALES SON DE FECHAS POSTERIORES AL DESPIDO Y REALIZAR DETERMINACIONES DE HECHOS SOBRE ÉSTOS, VIOLANDO ASÍ EL DEBIDO PROCESO DE LEY DEL QUERELLANTE.**

El 28 de junio de 2024, Western Auto presentó "**Alegato en Oposición a Apelación**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los

propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. S.L.G. Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168. Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte promovida por una moción de sentencia sumaria debe señalar y refutar los hechos materiales que entiende están en controversia y que son constitutivos de la causa de acción del demandante. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi et al., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 8; Roldán Flores v. M. Cuebas *et al.*, 199 DPR 664, 677 (2018).

Adicionalmente, en León Torres v. Rivera Lebrón, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". Íd., pág. 54.

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal

deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

Atinente a la controversia que nos ocupa, procede la resolución sumaria por insuficiencia de la prueba cuando, al concluir un descubrimiento de prueba, se desprende que la prueba que existe es insuficiente o inadecuada para sostener las alegaciones de la demanda y los elementos esenciales de la reclamación, por lo que corresponde desestimarla. Rodríguez Méndez *et al.* v. Laser Eye, 195 DPR 769, 787 (2016).

En tal caso, el promovente debe demostrar que: (1) la vista es innecesaria; (2) el demandante no cuenta con evidencia suficiente para probar algún hecho esencial de su causa de acción; y (3) como cuestión de derecho, procede la desestimación de la reclamación. Para disponer de una solicitud bajo esta modalidad, es indispensable que la parte promovida haya tenido oportunidad amplia para efectuar un descubrimiento de prueba adecuado. Ramos Pérez v. Univisión, 178 DPR 200, 217-218 (2010).

Ahora bien, para derrotar una moción de sentencia sumaria bajo la modalidad de insuficiencia de la prueba, la parte promovida puede presentar: (a) prueba admisible en evidencia; (b) prueba que pudiera ser

admisible, aunque al momento no lo sea; (c) prueba que demuestre que existe evidencia para probar los elementos esenciales de su caso; o (d) señale que hay prueba en el récord que pudiera ser admisible y derrotaría la contención de insuficiencia. A su vez, la parte promovida puede demostrar que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado; o que, por su naturaleza, se trata de un caso en el que no es conveniente que se resuelva por el mecanismo de la sentencia sumaria. Medina v. M.S. & D. Química P.R., Inc., 135 DPR 716, 734 (1994).

Esta normativa está cimentada en que el demandante tiene que probar su teoría y si no cuenta con prueba luego de culminar el descubrimiento de prueba, no se justifica llegar a etapa de juicio. Por ende, ante una moción de sentencia sumaria bajo la modalidad de insuficiencia de prueba, la parte promovida tiene que presentar su oposición de manera fundamentada. García Rivera *et al.* v. Enríquez, 153 DPR 323, 340 (2001); Ramos Pérez v. Univisión, *supra*, pág. 219.

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Dr. Bravo, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd*.* En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Íd. págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento

Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

Conviene desde ahora destacar que el Tribunal Supremo también ha expresado que es desaconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión de P.R, 178 DPR 200, 2019 (2010); Carpets & Rugs v. Tropical Reps, 175 DPR 615, 638 (2009). No obstante, "cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales" nada impide que se utilice la sentencia sumaria en casos donde existen elementos subjetivos o de intención. Ramos Pérez v. Univisión de P.R, *supra*, pág. 219.

**B.**

En nuestro sistema jurídico el contrato de servicios que concretiza una relación obrero-patronal se constituye como el medio principal de sustento para los empleados y sus dependientes. Díaz v. Wyndham Hotel Corp., 155 DPR 364, 374 (2001). Debido a ello, existe un interés estatal apremiante para reglamentar las relaciones obrero-patronales, de forma tal que las mismas se enmarquen en una política pública enfocada en salvaguardar los derechos de los trabajadores. Íd. De conformidad con lo anterior, se incorporó en la Ley Núm. 80-1976, *supra*, el requisito de "justa causa" como medida limitativa en toda causa de acción por despido. Por tanto, nuestra jurisprudencia ha establecido que este estatuto siempre debe ser interpretado de la forma más liberal y favorable al empleado. Ruiz

Mattei v. Commercial Equipment Finance, Inc., 213 DPR ___ (2024), 2024 TSPR 68; Jusino *et als.* v. Walgreens, 155 DPR 560, 571 (2001).

Así pues, "todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, donde trabaja mediante remuneración de clase alguna, contratado sin tiempo determinado, y que fuere despedido sin justa causa, tendrá derecho a recibir de su patrono, en adición al sueldo que hubiere devengado, el salario correspondiente a un mes por concepto de indemnización, conocida ésta como la indemnización básica, y una indemnización progresiva adicional equivalente a una semana por cada año de servicio". Díaz v. Wyndham Hotel Corp., *supra*, pág. 375. Para ser acreedor del remedio y de los beneficios que instituye la Ley Núm. 80, *supra*, el empleado separado de su cargo debe cumplir con los siguientes requisitos: (1) la existencia de una relación obrero-patronal remunerada; (2) que el empleado haya sido contratado por tiempo indeterminado;[1] y (3) que el empleado haya sido despedido sin que medie justa causa. C. Zeno Santiago y otros, Tratado de Derecho del Trabajo, San Juan, Puerto Rico, Publicaciones JTS, 2003, T. I, pág. 98.

Es preciso señalar que el ordenamiento jurídico en Puerto Rico no impide los despidos; solamente interpone el requisito de justa causa para ello. Le corresponde al promovente de la acción presentar la evidencia que demuestre la inexistencia de causa justificada para su terminación. Por su parte, el patrono puede presentar prueba que establezca, mediante la preponderancia de la evidencia, que hubo justa causa para el despido. En términos generales, el estatuto contempla dos tipos de causales para que el despido de un empleado se considere hecho con justa causa: (1) actuaciones imputables al obrero y de las cuales se entiende que ha provocado su despido; y (2) situaciones no imputables al obrero pero que son de tal naturaleza que su despido resulta prácticamente inevitable.

El Art. 2 de la Ley Núm. 80, *supra*, establece que será justa causa para el despido de un empleado lo siguiente:

    (a)    Que el empleado incurra en un patrón de conducta

---

[1] Aunque se ha establecido que la protección que ofrece la Ley sí es aplicable a aquellos empleados que han sido contratados por tiempo determinado si se probare que el contrato

impropia o desordenada.

(b) **Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono**.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento. 32 LPRA sec. 185b (énfasis suplido).

Nótese que nuestro ordenamiento jurídico cobija el poder de dirección empresarial, al reconocerles a los patronos el derecho de despedir a sus empleados, por cualquier razón no discriminatoria. Díaz v. Wyndham Hotel Corp., *supra*, pág. 377. Sobre el particular, cabe destacar que las circunstancias que contempla el estatuto en cuanto a lo que se entiende como causa que justifique el despido no son taxativas y que constituye justa causa para el despido aquella que está vinculada a la ordenada marcha y normal funcionamiento de una empresa. El Tribunal Supremo ha resuelto que "[l]ey no pretende ni puede . . . ser un código de conducta conteniendo una lista de faltas claramente definidas y la sanción que corresponde a cada una y en cada instancia, si ha de ser reprimenda, suspensión o despido". Srio. del Trabajo v. I.T.T., 108 DPR 536, 542 (1979). El concepto de "justa causa" "es dinámico, puesto que se nutre de múltiples y fluidas situaciones imposibles de prever". Srio. del Trabajo v. G.P. Inds., Inc., 153 DPR 223, 243 (2001).

El referido Art. 2 de la Ley 80 no pretende, ni puede, considerada la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una y en cada instancia. Srio. del Trabajo v. I.T.T., *supra*, pág. 542. Para propósitos de aplicar las diferentes leyes protectoras del trabajador el Tribunal Supremo ha utilizado, a manera de referencia, y sin ser exhaustivo y en forma orientadora, las enumeradas en el Art. 2 de la Ley 80 como causas justificadas para el despido. Belk v. Martínez, 146 DPR 215 (1998); Soto v. Hotel Caribe Hilton, 137 DPR 294 (1994); Rivera Águila v. K-Mart de P.R., 123 DPR 599, 610 (1989); Báez García v. Cooper Labs., Inc., 120 DPR 145, 151-152 (1987).  Dicho estatuto se limita a dar algunos ejemplos, no exhaustivos, de lo que se considera justa causa para el despido.

Es norma firmemente establecida en nuestra jurisdicción que no es justa causa para despedir a un empleado aquélla fundada en el libre arbitrio o capricho del patrono, sino que **las motivaciones del despido estén relacionadas con el buen funcionamiento de la empresa concernida**. Íd. Ahora bien, la Ley Núm. 80, *supra*, no prohíbe el despido de un empleado, sino que "[d]icho curso de acción como tal se reconoce como una facultad o derecho que ostenta todo patrono en una sociedad moderna que se desarrolla y desenvuelve alrededor y a base de las fuerzas del libre mercado y del derecho de propiedad o de dirección empresarial". Díaz v. Wyndham Hotel Corp., *supra*, pág. 377.

Así pues, se considera justa causa para el despido la que tiene su origen, no ya en el libre arbitrio del patrono, sino en razón vinculada a la ordenada marcha y normal funcionamiento de la empresa. Srio. del Trabajo v. I.T.T., *supra*, pág. 543. De conformidad con lo anterior, el Tribunal Supremo ha concluido que la **negligencia, incompetencia, deslealtad, desobediencia a las reglas y órdenes del patrono son motivos para despedir a un empleado**. Mercedes Bus Line v. Tribunal de Distrito, 70 DPR 690, 695 (1949).  Ahora bien, el despido predicado en la violación a las reglas de un patrono sería justificado, siempre y cuando: (1) la violación

a los reglamentos es reiterada; (2) las reglas y los reglamentos son razonables; (3) se suministre oportunamente copia escrita de los mismos al trabajador; y (4) el despido del empleado no se haga por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Rivera Torres v. Pan Pepín, Inc., 161 DPR 681, 690 (2004).

En el caso de Blanes v. Tribunal de Distrito, 69 DPR 113, 120 (1948), nuestro más Alto Foro expresó lo siguiente:

> En todo contrato de empleo existe, expresa o implícita, la condición de que el empleado habrá de cumplir con los deberes de su empleo en forma competente y como consecuencia si se demuestra que el empleado es incompetente, ineficiente o negligente, en tal forma que el continuar con sus servicios resultaría en perjuicio del patrono y aún de terceras personas, ese hecho constituye justa causa para el despido. Íd.

En consonancia con ello, se ha reconocido en nuestra jurisdicción que el despido, aún en primera ofensa, se considera justificado cuando el empleado incurre en conductas intencionales o cuando se trata de negligencia crasa en el desempeño de sus funciones. Srio. del Trabajo v. G.P. Inds., Inc., 153 DPR 223, 244-245 (2001). En tales casos, esa clase de conducta intencional, además de alterar la ordenada marcha de la empresa, revela un rasgo o detalle de carácter del empleado tan lesivo que resultaría imprudente esperar la reiteración de la misma para proceder con el despido. Igualmente, se justa causa para el despido una sola ofensa o primera falta como tal justa causa si, por su gravedad y su potencial de daño, pone en riesgo el orden, la seguridad o la eficiencia que constituyen la normalidad operatoria del establecimiento. Srio. del Trabajo v. I.T.T., *supra*, pág. 544.

**III.**

En el presente caso, el Apelante nos solicitó que revoquemos la *Sentencia* del TPI mediante la cual se declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**".

Los tres señalamientos de error esgrimidos están íntimamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En síntesis, el Apelante alega que el TPI erró y abusó de su discreción al

(1) dictar sentencia sumaria cuando existen controversias reales y sustanciales respecto a hechos esenciales y materiales, así como asuntos de credibilidad e intención que deben dirimirse en un juicio plenario, (2) concederle gran peso y valor a prueba irrelevante, impertinente, inadecuada y remota sobre acciones disciplinarias y al (3) admitir dos documentos con fechas posteriores al despido.

Por su parte, Western Auto sostiene que la prueba que aportó a su solicitud de sentencia sumaria demostró que, a base de los hechos materiales, procedía que se dispusiera del caso. Lo anterior, fundamentado en los incumplimientos desplegados por el Sr. Sierra Ríos con la política de descuentos que ocasionó serias pérdidas económicas para la empresa. Le asiste la razón al Apelado. Nos explicamos.

Conforme hemos adelantado, al momento de revisar una determinación del foro de instancia respecto a una solicitud de sentencia sumaria, estamos llamados a realizar una revisión de *novo* y limitarnos únicamente a adjudicar las controversias con los documentos que obran en el expediente ante el foro de instancia. Luego de efectuar dicho análisis, a la luz de la prueba que se presentó ante el TPI, determinamos que sobre los siguientes hechos esenciales y pertinentes no existe controversia:

1) El 22 de enero de 2006, el querellante comenzó a trabajar para la tienda Advance Auto Parts que ubica en La Plazoleta del Cantón Mall, en Bayamón.

2) El querellante ocupó varias posiciones en la empresa. En el 2016 fue ascendido a la posición de Gerente de Tienda.

3) Previo a ser Gerente de Tienda, el querellante fungió alrededor de tres años como Asistente de Gerente.

4) Al momento de la terminación de su empleo, el querellante era el Gerente de la tienda ubicada en la Plazoleta del Cantón Mall. Cada tienda es identificada a través del número asignado.

5) La tienda de Plaza Cantón Mall tiene asignado el número 1120.

6) Los Gerentes de Tiendas de WAPR responden a los Gerentes de Distritos District Manager" (DM).

7) Los DM en Puerto Rico se dividen por región o por la zona que configura el distrito.

8) Como Gerente de Tienda, entre otras cosas, el querellante tenía la responsabilidad de evaluar los empleados, tomar acciones disciplinarias, desarrollarlos e inspirarlos.

9) Para poder hacer las funciones con relación a los empleados el querellante tenía que estar familiarizado con las normas, políticas y procedimientos de la compañía. Si tenía dudas sobre estas, las tenía disponibles y las podía repasar, así como podía clarificarlas con Recursos Humanos o con el Gerente de Distrito.

10) En WAPR a los empleados se les llama "Team Members" (TM).

11) Todos los TM tenían un número asignado, en el caso del querellante su número era 307286.

12) Parte de las responsabilidades del querellante, como Gerente de Tienda, eran revisar y contestar correos electrónicos.

13) Mientras el querellante ocupó la posición de Gerente de Tienda en Plazoleta Cantón Mall, él era la persona al tope de la estructura de empleados de la tienda. En términos de estructura, como Gerente de la tienda de Plazoleta Cantón Mall, el querellante supervisaba a dos Asistentes de Gerentes o AGM, dos RPP (Retail Parts Pro), tres CPP (Commercial Parts Pro), un Especialista de Inventario, Vendedores, Mecánicos, Técnicos e Instaladores.

14) En el 2017 la DM de la tienda de Plazoleta de Cantón Mall era la Sra. Wanda Rivera, luego del paso del huracán María lo fue el Sr. Juan Rivera, le siguió el Sr. Héctor Lizasuain y finalmente al momento de su terminación, el DM era el Sr. Esteban Rivera.

15) Cuando la Sra. Wanda Rivera dejó la posición de DM, pasó a ocupar la posición de Vicepresidenta de Operaciones ("VPO"), antes de ella ese puesto lo ocupó el Sr. Edwin Colón.

16) Durante el período de reclamación, el Commercial Account Manager ("CAM") asignado a la tienda de Plazoleta Canto Mall del 2017 al 2022, era el Sr. Isaac Bermúdez.

17) Las acciones disciplinarias en la empresa se conocen como "Team Member Action Report" o "TMAR".

18) Cuando el querellante recibió acciones disciplinarias en la compañía siempre tuvo la oportunidad de dar su versión o comentarios sobre la misma.

19) Cuando el querellante tuvo algo que comentar o abundar sobre una acción disciplinaria lo hacía en el área de comentarios del documento.

20) Cuando el querellante firmaba documentos los revisaba antes de firmar.

21) El querellante conocía y entendía la Política de "Price Matching". Tenía acceso a la misma en "Startingline". El querellante no tenía dudas sobre dicha política porque la misma es clara.

22) La Política de "Price Matching" vigente durante el período de reclamación era conocida por el querellante.

23) El Sr. Fernando Rondinoni, "Senior Asset Protection Manager" (SAPM), era el supervisor de la Sra. Yarimel Viera (señora Viera), Asset Protection Manager (APM).

24) La señora Viera comenzó a trabajar para la compañía en octubre de 2020. Cuando esta comenzó a ocupar la posición de APM no había nadie en la posición dedicado al territorio de Puerto Rico. Por tanto, le tocó crear, junto con su supervisor, un plan de trabajo que integrara el análisis de los resultados operacionales de las distintas tiendas y el territorio, con la implementación correcta de las distintas políticas y procedimientos del negocio.

25) Debido a que la señora Viera comenzó a trabajar para la compañía estando la pandemia del COVID-19, le tomó un tiempo lograr la integración con los equipos de trabajo de las distintas tiendas, pues las visitas a las tiendas estaban limitadas para reducir el riesgo de contagio del COVID-19. De igual forma le tomó un tiempo familiarizarse con las normas, políticas y procedimientos de la compañía.

26) Como APM, la señora Viera está encargada, entre otras cosas, de velar por la protección de los activos de la compañía, la seguridad de las tiendas, así como del cumplimiento con las políticas y procedimientos del negocio.

Para cumplir con sus responsabilidades utiliza distintas herramientas provistas por la compañía, entre las que se encuentran la verificación rutinaria de distintos informes, incluyendo informes de ventas y de descuentos.

27) En el 2022, estando ya más familiarizada con los procesos internos del negocio, así como con las herramientas disponibles para ejercer sus funciones, la señora Viera comenzó a darle seguimiento a los informes de ventas con descuentos significativos a clientes comerciales. Es decir, descuentos de sobre 50% del precio de venta establecido o descuentos que el sistema avisa a la tienda eran descuentos con "Black Indicator", a saber, descuentos que al otorgarse hacían la transacción "no rentable". Entiéndase, que al momento de procesar una venta en tienda, el sistema en la tienda indica si la transacción es rentable o no para la operación. Hay cuatro indicadores de descuentos, "Green", "Yellow", "Red" y "Black".

28) La categoría "Green" le indica a la tienda que el descuento es aceptable y de poco impacto a las ganancias; la categoría "Yellow" le indica a la tienda que el descuento puede ser aceptable, pero reduce el margen de ganancia; la categoría "Red" indica que el descuento no es aceptable ya que impacta severamente el margen de ganancia; la categoría "Black" indica que el descuento no es aceptable porque se vende la mercancía por debajo del costo y no se obtienen ganancias de la transacción. De igual forma la política de "Price Matching" establece que los descuentos se deben realizar utilizando los colores de indicación de la transacción, y que al otorgar un descuento se deben asegurar que la transacción sigue siendo "profitable" o rentable para el negocio.

29) En el 2022 como parte del monitoreo de los informes de descuentos, la señora Viera comenzó a identificar ciertas transacciones en la tienda 1120, tienda que estaba bajo la supervisión del querellante. Específicamente en marzo de 2022, levantó bandera sobre varias transacciones con sobre 50% de descuento en dicha tienda, transacciones que estaban con indicador "Black". Le notificó esas transacciones al DM y a la VPO para su correspondiente investigación. Por dichas transacciones no se tomaron acciones disciplinarias, pero el Sr. Esteban Rivera dio instrucciones a la tienda de ser más cuidadosos al momento de otorgar descuentos.

30) El 8 de julio de 2022 el querellante recibió una acción disciplinaria. Dicha acción disciplinaria fue por autorizar en dos transacciones separadas descuentos de 71.53%. Específicamente las transacciones 4079 y 3699. En la transacción número 4079 del 25 de junio de 2022 se vendió mercancía por el precio de $8,426.88, luego de otorgar un descuento de $21,168.00. En la transacción 3699 del 10 de junio de 2022 se vendió mercancía por la cantidad $4,213.44, luego de haber otorgado un descuento de $10,584.00.

31) Como parte de la acción disciplinaria del 8 de julio de 2022, se le informó al querellante que no podía dar el tipo de descuentos discutidos. Se le informó, además, que transacciones de esa naturaleza afectan el margen de ganancia o "gross margin" del negocio. Se le avisó, también, entre otras cosas, que si tenía dudas debía notificarlo para orientarlo, y que de no mostrar mejoría se podrían tomar otras acciones correctivas incluyendo hasta la terminación de empleo.

32) En la acción disciplinaria del 8 de julio de 2022 se instruyó al querellante a repasar la política de "Price Matching", cosa que este hizo.

33) En la acción disciplinaria del 8 de julio de 2022, el querellante se comprometió a "seguir mejorando en las áreas

de oportunidades y siempre buscando lo mejor para la tienda".

34) En la acción disciplinaria del 8 de julio de 2022, el querellante no informó, como ahora alega, que dichas transacciones fueran aprobadas por el DM o el CAM.

35) El 5 de agosto de 2022, el querellante recibió una acción disciplinaria por haber otorgado descuentos a clientes comerciales que no se ajustaban a la política de descuentos de la compañía.

36) Específicamente el querellante fue amonestado el 5 de agosto de 2022 por los descuentos autorizados en las transacciones 431 y 610 de 11 y 14 de julio de 2022 respectivamente.

37) Las dos transacciones por las que fue amonestado el 5 de agosto de 2022 fueron autorizadas por el querellante 3 y 6 días después de la amonestación del 8 de julio de 2022.

38) La acción disciplinaria de 5 de agosto de 2022 fue catalogada como última advertencia escrita. En dicha acción disciplinaria se le ordenó al querellante a que cesara y desistiera de ese tipo de práctica. Se le instó nuevamente a que repasara la política y procedimiento de igualación de precios o "Price Matching Policy". También se le exhortó a que siguiera las políticas de la empresa y se le recalcó que de tener dudas o preguntas sobre las políticas y procedimientos establecidas en el manual de empleado que las expresara para orientarlo. Finalmente, se le volvió a advertir que de no mostrar mejoría se tomarían acciones correctivas incluyendo la terminación del empleo.

39) En la acción disciplinaria del 5 de agosto de 2022 el querellante escribió en la parte de comentarios que estaba "comprometido a buscar lo mejor para la tienda, desde las ganancias e integridad del inventario. Estaré más al pendiente de las ventas de mayor volumen de mercancía, que se le esté ganando el % correcto".

40) En la acción disciplinaria del 5 de agosto de 2022, el querellante no informó, como ahora alega, que dichas transacciones fueran aprobadas por el DM o el CAM.

41) El 25 de agosto de 2022, el querellante volvió a autorizar un descuento de más de 50% a un cliente comercial. En ese momento no se tomaron acciones disciplinarias por ello.

42) En el mes de noviembre de 2022 se identificaron varias transacciones adicionales con descuentos fuera de lo normal en la tienda 1120, dichas transacciones fueron investigadas y se discutieron con el señor Sierra quien admitió haber autorizado dichos descuentos sin haber recibido instrucciones de darlos.

43) El 21 de noviembre de 2022, el querellante fue entrevistado sobre cada una de esas transacciones y se le dio oportunidad de dar su versión de lo sucedido. El querellante suscribió una declaración voluntaria.

44) En su declaración voluntaria el querellante no informó, como ahora alega, que dichas transacciones fueran autorizadas por el DM o el CAM. El querellante reconoció que sí había autorizado dichos descuentos y no recibió instrucciones para darlos.

45) El 25 de noviembre de 2022 se procedió con la terminación de empleo del querellante.

46) El querellante conocía la política de puertas abiertas de la compañía.

47) Con relación a la situación de los descuentos ocurridos en el 2022, el querellante no utilizó la política de puertas abiertas ni con la Sra. Wanda Rivera ni con Recursos Humanos.

48) El 10 de julio de 2018 el querellante recibió una notificación por correo electrónico con las actualizaciones del manual del empleado (por hora y del asalariado).

49) La Política de Comisiones de Gerente General de la Compañía de 2022 establece que, para ser acreedor y elegible para el pago de comisiones por venta, el empleado tiene que estar activo al momento del pago.

50) El 27 de enero de 2014 el querellante recibió una acción disciplinaria por incumplimiento con la meta de ventas durante el período 1 de dicho año. El querellante escribió en la parte de comentarios su posición con respecto a la acción disciplinaria.

51) El 11 de octubre de 2014, el querellante recibió una acción disciplinaria por no cumplir su jornada de trabajo ni excusarse correctamente. Dicha amonestación el querellante no quiso firmarla, pero entregó un escrito a mano que se hizo formar parte de la amonestación mediante el cual expresó su posición sobre la acción disciplinaria.

52) El 19 de noviembre de 2014, el querellante recibió una acción disciplinaria por no cumplir con responsabilidades de su posición como AGM (Assistant) General Manager). El querellante indicó en la parte de comentarios su posición con relación a la referida acción disciplinaria.

53) El 13 de septiembre de 2018 ya en la posición de Gerente de Tienda en Cantón Mall, el querellante fue amonestado por manejo de horas presupuestadas, horarios y overtime en exceso del establecido. El querellante escribió en la parte de comentarios su posición con respecto a la acción disciplinaria.

54) El 23 de abril de 2019 el querellante recibió una acción disciplinaria por manejo de horas presupuestadas, horarios y overtime en exceso del establecido. El querellante escribió en la parte de comentarios su posición con respecto a la acción disciplinaria.

55) El 29 de abril de 2019, el entonces DM, el Sr. Juan Rivera, discutió con el querellante los resultados operacionales de su tienda y las áreas de oportunidad.

56) El 11 de abril de 2019, el querellante recibió una acción disciplinaria por manejo de horas presupuestadas, horarios y overtime en exceso del establecido. El querellante escribió en la parte de comentarios su posición con respecto a la acción disciplinaria.

57) El 21 de mayo de 2019, el querellante recibió una acción disciplinaria de parte del entonces DM, el Sr. Juan Rivera, por falta de control y seguridad en el manejo de los vehículos de la flota de la Compañía. El querellante no estuvo de acuerdo y así lo expresó en la parte de comentarios de la acción disciplinaria.

Establecido lo anterior, nos dirigimos a analizar los señalamientos de error. El señor Sierra Ríos argumenta que el TPI abusó de su discreción al otorgarle gran peso a la declaración jurada de la "Asset Protection Manager" de Western Auto, la Sra. Yarimel Viera (en adelante, la "señora Viera") y al dar por admitido el "Price Override/Matching Report" y el "Price Matching Policy", siendo estos documentos de fecha posterior al despido. Veamos.

Del expediente ante nuestra consideración surgen las siguientes circunstancias, a saber: (1) el Apelante comenzó a trabajar en la tienda Advance Auto Parts el 22 de enero de 2006, (2) posteriormente, ocupó la posición de Gerente, (3) éste estaba familiarizado con las políticas y procedimientos de la compañía, incluyendo el "Price Matching", (4) el 8 de julio de 2022, recibió una acción disciplinaria por autorizar descuentos de 71.53%, (5) el 5 de agosto de 2022, recibió una segunda acción disciplinaria catalogada como última advertencia por haber otorgado nuevamente descuentos que no se ajustaban a la política de descuentos de la compañía, (6) a pesar de estas acciones disciplinarias, el Apelante continuó realizando transacciones cuyos descuentos excedían el 50%, y (7) el 25 de noviembre de 2022, el señor Sierra Ríos fue despedido de su empleo.

Conforme hemos adelantado en los acápites anteriores, según la Ley Núm. 80, *supra*, un patrono debe contar con justa causa para proceder con el despido de un empleado. Un despido se considera justificado cuando el empleado incurre en un patrón de conducta impropia o desordenada, se desempeña de manera deficiente o reiteradamente infringe las reglas y reglamentos de la empresa. 29 LPRA sec. 185b. De ahí que, le corresponde al empleado establecer, mediante el aporte de prueba a esos efectos, que fue despedido en contravención con las disposiciones de la Ley Núm. 80, *supra*.

Entiéndase, es indispensable que se demuestre que las motivaciones del despido no estuvieron directamente relacionadas con el óptimo funcionamiento de la empresa afectada. Así pues, si la evidencia establece que el empleado es incompetente, ineficiente o negligente, contraria a las políticas internas de la compañía y que su permanencia sería perjudicial para el patrono, entonces estamos ante un caso en el que medió justa causa para el despido. Blanes v. Tribunal de Distrito, *supra*, pág. 120.

Tras analizar detenida y comprensivamente los documentos que obran en el expediente, incluyendo la "**Moción de Sentencia Sumaria**", su *Oposición* y los documentos anejados a dichos escritos, hemos llegado a

la conclusión de que el despido del Apelante fue uno justificado. Nos explicamos.

No existe controversia sobre el hecho de que los descuentos en Western Auto están permitidos por el patrono. Ahora bien, los mismos tienen que cumplir con unos parámetros específicos que no representen un menoscabo económico para el Apelado. Primeramente, debemos establecer que la prueba aportada por Western Auto en su solicitud de sentencia sumaria se centró en el testimonio bajo juramento ofrecido por el propio Apelante durante la toma de su deposición, los anejos que fueron debidamente autenticados durante la misma, y la Declaración Jurada prestada por la señora Viera, así como la documentación que se presentó como evidencia de lo expresado en la misma y que igualmente cumplió razonablemente con los requisitos de autenticación requeridos en nuestro ordenamiento jurídico. En otras palabras, estamos ante un caso en el que la prueba presentada logró cumplir con el estándar requerido por la Regla 36 de Procedimiento Civil, *supra*.

Como parte de sus argumentos, el señor Sierra Ríos sostiene que los descuentos en controversia fueron autorizados por sus superiores, no obstante, la evidencia sugiere lo contrario. El análisis comprensivo de la prueba establece que el Apelante fue objeto de varias medidas disciplinarias, lo cual, demostró su incumplimiento con las normas, políticas y procedimientos del que fue su patrono. Esto es así ya que se estableció que la conducta de proveer descuentos de más del 50% de los productos perjudicaba directamente a Western Auto. **Dicho comportamiento representa una actuación deficiente, insatisfactoria y negligente por parte del señor Sierra Ríos que acarreó serias consecuencias económicas para la empresa**. Es menester resaltar que este fue advertido en dos ocasiones, a través de distintas acciones disciplinarias, que su conducta no era aceptable puesto que le ocasionaba pérdidas monetarias al Apelado.

Específicamente, el 8 de julio de 2022, el Sr. Sierra Ríos recibió una acción disciplinaria. **Dicha acción disciplinaria fue por autorizar en dos**

**(2) transacciones separadas descuentos de 71.53%.**[2] En la transacción número 4079 del 25 de junio de 2022, "se vendió mercancía por el precio de \$8,426.88, **luego de otorgar un descuento de \$21,168.00**".[3] En la transacción 3699 del 10 de junio de 2022, "se vendió mercancía por la cantidad \$4,213.44, **luego de haber otorgado un descuento de \$10,584.00**".[4]

Como parte de dicha acción disciplinaria, se le informó al querellante que no podía dar el tipo de descuentos discutidos. **Se le informó, además, que transacciones de esa naturaleza afectan el margen de ganancia o "gross margin" del negocio. Se le avisó, también, entre otras cosas, que si tenía dudas debía notificarlo para orientarlo, y que de no mostrar mejoría se podrían tomar otras acciones correctivas incluyendo hasta la terminación de empleo**.[5] **Asimismo, al Sr. Sierra Ríos se le invitó a repasar nuevamente las políticas y procedimientos de igualación de precios ("Price Matching").**[6] Es de particular importancia destacar que el propio Apelante se comprometió a "**seguir mejorando en las áreas de oportunidades y siempre buscando lo mejor para la tienda**".[7] Debemos destacar que en dicha acción disciplinaria del 8 de julio de 2022, el Apelante no informó que dichas transacciones estuvieran aprobadas por sus superiores, y simplemente se limitó a alegar que sí lo fueron, sin aportar prueba documental admisible a esos efectos.

Igualmente, el 5 de agosto de 2022, el Apelante recibió una acción disciplinaria por haber otorgado descuentos a clientes comerciales que no se ajustaban a la política de descuentos de la compañía. Específicamente, el Sr. Sierra Ríos fue amonestado por los descuentos autorizados en las transacciones 431 y 610 del 11 y 14 de julio de 2022, respectivamente.[8] **Nótese, pues, que ambas transacciones por las que fue amonestado**

---

[2] *Véase*, Apéndice del recurso de apelación, págs. 81 y 175.
[3] Íd. (énfasis suplido).
[4] Íd. (énfasis suplido).
[5] *Véase*, Apéndice del recurso de apelación, pág. 175.
[6] Íd.
[7] *Véase*, Apéndice del recurso de apelación, pág. 176 (énfasis suplido).
[8] *Véase*, Apéndice del recurso de apelación, pág. 81.

**el Apelante, por segunda ocasión, fueron autorizadas por éste a sólo 3 y 6 días, respectivamente, posterior a la amonestación del 8 de julio de 2022**.

Sobre el particular, dicha acción disciplinaria fue catalogada como última advertencia escrita.[9] **Allí se le ordenó al Apelante a que cesara y desistiera de ese tipo de práctica**.[10] Se le instó nuevamente a que repasara la política y procedimiento de igualación de precios o "Price Matching Policy".[11] **También se le exhortó a que siguiera las políticas de la empresa y se le recalcó que de tener dudas o preguntas sobre las políticas y procedimientos establecidas en el manual de empleado que las expresara para orientarlo. <u>Finalmente, se le volvió a advertir que de no mostrar mejoría se tomarían acciones correctivas incluyendo la terminación del empleo</u>**.[12]

Además, en la acción disciplinaria del 5 de agosto de 2022 el Sr. Sierra Ríos escribió en la parte de comentarios que estaba "**comprometido a buscar lo mejor para la tienda, desde las ganancias y [sic] integridad del inventario. Estaré más al pendiente de las ventas de mayor volumen de mercancía, que se le esté ganando el % correcto**".[13] Igualmente, se le informó que toda excepción a lo antes mencionado debía ser aprobado por el Gerente de Distrito.[14] Sin embargo, el Apelante no informó que dichas transacciones estuvieron aprobadas por sus superiores, y simplemente se limitó a alegar que sí lo fueron, sin aportar prueba documental admisible a esos efectos.

De otra parte, durante el mes de noviembre de 2022, se identificaron varias transacciones adicionales con descuentos fuera de lo normal en la tienda 1120.[15] **<u>Dichas transacciones fueron investigadas y se discutieron con el Sr. Sierra Ríos, quien admitió haber autorizado dichos descuentos sin haber recibido instrucciones de darlos</u>**.[16] De

---

[9] *Véase*, Apéndice del recurso de apelación, pág. 201.
[10] Íd.
[11] Íd.
[12] *Véase*, Apéndice del recurso de apelación, pág. 202.
[13] Íd. (énfasis suplido).
[14] *Véase*, Apéndice del recurso de apelación, pág. 201.
[15] *Véase*, Apéndice del recurso de apelación, pág. 81.
[16] *Véase*, Apéndice del recurso de apelación, pág. 100.

hecho, el Apelante suscribió una declaración voluntaria intitulada: "Advanced Stores Company, Inc. Statement", **en la que reconoció que dichas transacciones tampoco fueron autorizadas por sus superiores, a pesar de habérsele advertido de ello en la amonestación del 5 de agosto de 2022.**[17]

Es decir, las actuaciones del señor Sierra Ríos redundaron en la pérdida de miles de dólares para Western Auto. De hecho, la documentación que obra en el expediente establece que al Apelante se le explicó la extensión perjudicial de sus actuaciones y su impacto sobre las políticas operacionales del patrono. Igualmente, se demostró que se le orientó a los efectos de que dicha conducta no estaba autorizada y a que repasara la política de descuentos de la empresa denominada "Price Matching Policy". Además, de la evidencia presentada surge claramente que el señor Sierra Ríos se comprometió a mejorar dichas áreas de oportunidad. **<u>Sin embargo, su comportamiento posterior sugirió otra cosa</u>. Se estableció, por tanto, el alejamiento vertiginoso de los parámetros aceptables para el patrono, en lo concerniente a las políticas de descuentos.** Fue por todas estas transacciones que el Apelante fue despedido el 25 de noviembre de 2022.

Nótese, pues, que las razones para la terminación del Sr. Sierra Ríos se fundamentaron en transacciones autorizadas por éste que implicaron descuentos del 71% y más del 50%. No conforme con ello y en transacciones posteriores, Western Auto tuvo que volver a orientar al Apelante por autorizar unas transacciones fuera del espectro permitido, incluyendo una otorgada con un descuento de $5,601.60. Fue en esta ocasión que se le advirtió que tenía que cesar dicha conducta inmediatamente. A pesar de esta advertencia, durante los meses de agosto, octubre y noviembre del 2022, el señor Sierra Ríos continuó efectuando descuentos contrarios a las políticas del patrono. Tal cual ocurrido en las ocasiones anteriores, el Apelante reconoció –por escrito– su comportamiento violatorio de la reglamentación de Western Auto.

---

[17] <u>Íd</u>.

En suma, surge del expediente prueba tendente a establecer que el Apelante desplegó una conducta negligente y separada de los estándares requeridos por el Apelado y con sus actuaciones continuó proveyendo descuentos con "Black Indicators" que redundaban en transacciones no rentables para la empresa. Esto a pesar de haber sido orientado e invitado a repasar las políticas de descuentos aplicables. De éstas surge claramente que lo más beneficioso para Western Auto era ofrecer descuentos que **no resultaran en pérdidas para la tienda**. Por tanto, su repetida negligencia resultó en un despido justificado.

Por otro lado, en un intento para que descartáramos la prueba presentada por Western Auto en su moción de sentencia sumaria, el Apelante argumentó que el documento intitulado "Price Override/Matching Report" eran de fecha posterior al despido y no fue debidamente autenticado. Al examinar la Declaración Jurada ofrecida por la señora Viera, notamos que el aludido documento fue autenticado por esta última. La referida Declaración Jurada contiene varias expresiones relacionadas con la identificación del "Price Override/Matching Report" para hacer alusión a las transacciones contrarias a las políticas de descuento del patrono que efectuó el señor Sierra Ríos. Igualmente, dicho documento no versaba sobre transacciones posteriores al despido del Apelante. La fecha a la que alude este último, a saber, el 15 de febrero de 2023, fue la fecha en que se imprimió dicho documento.

Reiteramos, la prueba arrojó que dentro de las funciones de la señora Viera se encontraba proteger los activos de la compañía y realizar un plan de trabajo que integrara el análisis de los resultados operacionales de las distintas tiendas, con la implementación correcta de las distintas políticas y procedimientos de Western Auto. De igual manera, para cumplir con sus prerrogativas, ésta verificaba continuamente distintos informes, incluyendo los informes de ventas y descuentos. Es decir, la señora Viera tenía conocimiento personal del contenido de los referidos documentos, los procesos internos instituidos en la compañía que están instrumentados en los reglamentos y con su versión de los hechos consignada en la

Declaración Jurada, tanto el TPI como este foro apelativo intermedio estamos en posición de concluir que los hechos relacionados con el proceso de ventas y descuentos fueron probados, **en ausencia de evidencia aportada por el Apelante que los controvirtieran**. Por tanto, no se equivocó el TPI a utilizar dicho documento en unión con la Declaración Jurada de la señora Viera para efectuar sus determinaciones de hechos incontrovertidos y arribar a sus conclusiones de derecho.

Por último, un análisis desapasionado y mesurado de los documentos anejados a las respectivas mociones no establece que haya mediado asuntos de credibilidad o intención como lo arguye el Apelante. Todo lo contrario, la prueba presentada junto con la moción de sentencia sumaria presentada por Western Auto demostró que el despido del señor Sierra Ríos estuvo justificado, pues este último incumplió con las políticas internas de quien fuera su patrono. Las conclusiones de derecho a las que arribó el TPI en la *Sentencia* apelada se ajustaron específicamente a la evidencia que tuvo ante sí dicho foro. Por lo tanto, no se cometieron los errores señalados. El despido del Apelante efectuado por Western Auto se ajustó a los contornos jurídicos que rigen en materia laboral, pues se demostró que el Sr. Sierra Ríos violentó en varias ocasiones la política para otorgar descuentos de la empresa, a pesar de haber sido advertido de que dichas transacciones eran contrarias a la reglamentación interna y que estaban repercutiendo en las finanzas del Apelado.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* la *Sentencia* apelada mediante la cual el TPI desestimó –con perjuicio– la "**Querella**", por entender que el despido del Sr. Sierra Ríos fue justificado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones